**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **ANGELA J. BEHNKE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:14cv00012 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | BY: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Angela J. Behnke, ("Behnke"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Behnke protectively filed an application for DIB on April 21, 2011,[1] alleging disability as of September 30, 2008, due to interstitial cystitis, endometriosis and depression.[2] (Record, ("R."), at 12, 201, 228.) The claim was denied initially and on reconsideration. (R. at 52-57, 60-67, 89-91, 95-97, 101-03, 106-08, 110-12, 113.) Behnke then requested a hearing before an administrative law judge, ("ALJ"), (R. at 114-15), which was held by video conferencing on December 17, 2012, and at which Behnke was represented by counsel. (R. at 26-51.)

By decision dated January 10, 2013, the ALJ found that Behnke met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2010. (R. at 12-22.) The ALJ also found that Behnke had not engaged in substantial gainful activity since her alleged onset date. (R. at 14.) The ALJ found that the medical evidence established that, since the alleged onset date, Behnke suffered from severe impairments, namely sciatica due to stimulator implant; degenerative disc disease; interstitial cystitis, ("IC"); endometriosis; anxiety disorder; and depressive disorder, but he found that Behnke did not have

---

[1] The ALJ's decision notes the protective filing date as April 22, 2011, but the Disability Report lists it as April 21, 2011. (R. at 224.)

[2] Behnke also filed an application for SSI on the same date, which was denied because she earned too much income to meet the eligibility requirements. (R. at 81-84.)

-2-

an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, through the date last insured. (R. at 14-15.) The ALJ found that Behnke had the residual functional capacity to perform a range of medium work,[3] which required no more than one- or two-step instructions, did not require her to work around vibration or hazards and which allowed her to have access to restrooms as found in a typical business office or place of business that is open to the public. (R. at 16-20.) The ALJ found that, through her date last insured, Behnke was able to perform her past relevant work as a cashier. (R. at 20-22.) Based on Behnke's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Behnke could perform, including jobs as a cleaner and a mail clerk. (R. at 21-22.) Thus, the ALJ found that Behnke was not disabled at any time from September 30, 2008, through March 31, 2010. *See* 20 C.F.R. §§ 404.1520(f),(g) (2014).

After the ALJ issued his decision, Behnke pursued her administrative appeals, (R. at 6-8), but the Appeals Council denied her request for review. (R. at 1-4.) Behnke then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Behnke's motion for summary judgment filed October 6, 2014, and the Commissioner's motion for summary judgment filed December 8, 2014.

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time and occasionally lifting or carrying items weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2014).

*II. Facts*

Behnke was born in 1967, (R. at 201), which classified her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education with some college classes and past relevant work experience as a cashier, a customer service representative, an officer manager, a teacher's aide and a trainer at a call center. (R. at 30, 229.) Behnke testified at her hearing that she had worked at a call center until sometime in the Fall of 2009. (R. at 31.) She stated that she could not work due to IC of the bladder, which caused inflammation, spasms, pain, urgency and frequency. (R. at 36.) Behnke estimated that she used the restroom 20 to 30 times daily, and she had been reprimanded for such use at previous employment. (R. at 37, 45-46.) Specifically, she stated that her job at the call center allowed only scheduled breaks. (R. at 45.)

Behnke further testified that she had sciatica of the left leg, which caused difficulty standing and walking, as well as sitting for long periods. (R. at 36.) She stated that these multiple conditions "exhaust[ed] her" and it was "hard to just … maintain a normal day." (R. at 36.)

According to Behnke, most activities aggravated her bladder pain. (R. at 36.) She stated that holding her urine would result in "pinpoint bleeding," which would cause more nausea, inflammation and pain. (R. at 37.) This, in turn, usually would result in a flare-up, which could last from two weeks to three months, during which time, her symptoms were intensified, and her limitations were increased. (R. at 44.) Therefore, Behnke explained it was very important for her to have access to a restroom. (R. at 37.) She stated that medication made her condition "bearable," but she remained uncomfortable all the time. (R. at 36.)

-4-

Behnke testified that, during flare-ups, after voiding, spasms were so bad, that by the time she was ready to leave the restroom, she had to sit back down because it felt as if she were going to void on herself. (R. at 37-38.)

Behnke testified that she had undergone dimethylsulfoxide, ("DMSO"), treatment, silver nitrate treatment and bladder cocktails,[4] and she also had an InterStim® device[5] implanted for her urgency and frequency symptoms, which had to be removed, as it caused more problems than it alleviated. (R. at 38.) Behnke further stated that she had undergone two scoping procedures and had been prescribed medications. (R. at 38.) She stated that her doctors had no other recommendations for her, but wanted her to continue taking medications. (R. at 38.) Behnke stated that her diet affected her IC symptoms, noting that she drank water, milk and sometimes Sprite, could eat no processed or aged foods, and many preservatives and fruits and vegetables were off-limits. (R. at 44-45.)

Behnke testified that she also had bad discs in her neck and lower back that affected her ability to sit, stand and walk for long periods, as well as her ability to look down and write, and it caused burning in her arms. (R. at 36.) Behnke testified that she believed the InterStim® device caused her sciatica, which was aggravated by sitting, standing and walking. (R. at 38-39.) She estimated that she could stand about 10 minutes, walk less than five minutes and sit between five and 10 minutes before having to take a break. (R. at 38.) Behnke stated that, once the

---

[4] A bladder cocktail, or bladder instillation, is a mixture of medicines put directly into the bladder. *See* https://www.ichelp.org/Page.aspx?pid=367 (last visited May 6, 2015).

[5] An InterStim® device is a small implanted medical device the size of a stop watch that sends mild electrical impulses to the sacral nerves which may relieve the symptoms of urinary retention and overactive bladder in some patients. *See* https://www.urologyteam.com/interstim-or-sacral-nerve-stimulation (last visited May 6, 2015).

implant was removed, she underwent extensive therapy for "drop foot." (R. at 39.) According to Behnke, she underwent several adjustments to the InterStim® device in an attempt to get some relief from her IC symptoms, but to no avail. (R. at 39.)

Behnke testified that her medical issues, which had led to an inability to work, feelings of worthlessness and difficulty concentrating, resulted in depression. (R. at 40-41.) She stated that she had thought about harming herself. (R. at 40.) Behnke testified that she had undergone counseling in the past and was taking medications, but she did not think they helped. (R. at 40-41.) She stated that she lived with her husband, who bore the brunt of the household chores, but noted that she dusted, washed dishes and kept the house picked up. (R. at 41-42.) Behnke testified that when she got up, she went to the restroom, let the dogs out, got a glass of water, took her medication, and returned to the restroom. (R. at 42.) She then would plan her day, she might read a little, talk to a few family members on the computer, walk her dog around the pond, do what little housework she could in between and constantly go back and forth to the restroom. (R. at 42.) She stated that she slept only approximately four hours nightly due to frequent restroom use. (R. at 42.)

Robert Jackson, a vocational expert, also was present and testified at Behnke's hearing. (R. at 46-50.) Jackson classified Behnke's past work as a customer service representative and as a trainer at a call center as sedentary[6] and

---

[6] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2014).

skilled. (R. at 48.) He classified her past work as a teacher's aide, a bartender/waitress and as a teller as light[7] and semi-skilled, as a cashier and deli worker as light and unskilled, as an office manager and as a bookkeeper as sedentary and skilled and as a tax preparer and a receptionist/insurance clerk as sedentary and semi-skilled. (R. at 48.) Jackson testified that a hypothetical individual of Behnke's age, education and work history, who could perform medium work requiring no more than one- to two-step job instructions, requiring no work around vibration and hazards and which allowed access to restrooms as would be found in a typical business office or place of business that is open to the public, could perform Behnke's past work as a cashier. (R. at 48-49.) Jackson further testified that there was a significant number of jobs existing in the national economy that such an individual could perform, including those of a planter, a cleaner and a mail clerk. (R. at 49-50.) Jackson also testified that the same hypothetical individual, but who would be off-task more than 10 percent of the workday due to frequent restroom breaks, could not perform any jobs existing in significant numbers in the national economy. (R. at 50.)

In rendering his decision, the ALJ reviewed medical records from War Memorial Hospital; Saint Mary's Hospital; Midwest Prostate and Urological Institute; Wellmont Holston Valley Medical Center; Mountain View Regional Medical Center; Blue Ridge Neuroscience Center; Dr. Felix E. Shepard, Jr., M.D.; Norton Community Hospital; Wake Forest Baptist Hospital Comp Rehab Orthopaedics Outpatient Clinic; Pikeville Medical Center; Abingdon Center;

---

[7] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2014).

Dickenson Community Hospital; and Dr. Virginia Baluyot, M.D.

The record demonstrates that Bhenke had complaints of chronic pelvic pain, bladder pain, urgency and frequency since at least 2000. (R. at 279-80, 289.) In September 2000, Behnke was diagnosed with a history of endometriosis and a history of IC, among other things. (R. at 287.) In June 2002, Behnke was diagnosed with IC, neurogenic bladder, urethral stenosis, bladder tumor and left flank pain. (R. at 291.) In September 2002, an InterStim® device was surgically implanted to help manage Behnke's IC symptoms. (R. at 293.) Over the next eight months, the medical records show that the device was adjusted or reprogrammed, but Behnke continued to voice complaints related to her IC. (R. at 293-98.)

Behnke saw Dr. Douglas Browning, M.D., at Wake Forest Comp Rehab Orthopaedics Outpatient Clinic, ("Wake Forest"), on December 16, 2004, for a consultative evaluation of back pain. (R. at 456-58.) She voiced complaints of left lower back pain that radiated down the left leg since the implantation of the InterStim® device, which had worsened since August 2004, despite adjustments to the device. (R. at 456.) Behnke stated that her most comfortable position was sitting, while lying prone, standing for any prolonged period and walking were difficult. (R. at 456.) Behnke denied any history of back pain prior to the implant. (R. at 456.) She saw Dr. Scott MacDiarmid, M.D., a urologist at Wake Forest, to discuss treatment for the implant device. (R. at 456.) She endorsed pain with urination, but had no then-current symptoms of urgency or frequency. (R. at 457.) Dr. Browning noted that Behnke appeared comfortable sitting in the chair in no acute distress. (R. at 457.) Her mood appeared normal, her affect and intelligence

-8-

were normal, and she did not seem depressed at all. (R. at 457.) Behnke exhibited pain to palpation over the area of the left L4-L5 paraspinous area, as well as the left SI joint. (R. at 457.) She traced pain down the course of the sciatic nerve, and there was pain with palpation in that area. (R. at 457.) Deep tendon reflexes were 1+ bilaterally with no pain in the knee with palpation, flexion and extension. (R. at 457.) There was pain with palpation in the knee in the popliteal area that radiated down the side of the leg that reproduced her pain. (R. at 457.) Pulses in the foot were 2+, but there was no numbness. (R. at 457.) Dr. Browning diagnosed sciatica nerve pain and a history of IC. (R. at 457.) Behnke was adamant about having the device removed, and Dr. Browning noted that there did not seem to be another medical contributing factor identified at that time. (R. at 457.) He planned to try anti-inflammatories for more pain relief, increasing her Elavil and attempting physical therapy. (R. at 457.)

When Behnke returned to Dr. Browning on February 17, 2005, she reported that the InterStim® device had been removed the previous month, and she reported a 30 to 40 percent improvement in her symptoms. (R. at 459-60.) However, Behnke reported a continued burning, radiant pain from the left buttock down into the foot, for which she was taking Bextra, which helped. (R. at 459.) She complained of difficulty relaxing the muscles in her leg, mainly in the thigh and hip area. (R. at 459.) She had one physical therapy visit and was very interested in returning for more. (R. at 459.) Behnke was in no acute distress. (R. at 459.) Physical examination was normal, except for some hyper-reflexivity at the left knee and ankle and tenderness to palpation in the left buttock and piriformis area. (R. at 459.) Dr. Browning diagnosed sciatica, piriformis syndrome and muscle spasm and tightness in the low back, buttock and hip area. (R. at 459.) He added

Flexeril as needed for muscle spasms to Behnke's medication regimen. (R. at 459.)

Behnke was seen for an Intake Assessment at Abingdon Center on January 13, 2007. (R. at 503-08.) She endorsed insomnia, decreased appetite, daily crying spells and decreased energy. (R. at 504.) Behnke reported past abuse, and she stated that she was taking medications for depressive symptoms. (R. at 505.) On mental status examination, Behnke had normal speech, fair insight, she was fully oriented, she had average judgment, she was of average intelligence, she had no evidence of a thought disorder, no hallucinations, she had a depressed mood and affect, no suicidal or homicidal thoughts, appropriate behavior, fair recent and long-term memory, fair communication and calm motor activity. (R. at 505.) Behnke was diagnosed with major depressive affective disorder, recurrent, severe, without psychotic behavior; and observation of other suspected mental condition; and her then-current Global Assessment of Functioning, ("GAF"),[8] score was assessed at 60.[9] (R. at 506.) She was scheduled for individual therapy every two weeks for 18 sessions. (R. at 506.) Behnke received counseling at Abingdon Center on six occasions from January 27, 2007, to April 21, 2007. (R. at 502, 509-10.) During this time, Behnke complained of mild to severe depression, mild to moderate crying spells, mild to moderate irritability/anger and mild insomnia. (R. at 502, 509-10.) Mental status examinations were fairly benign, indicating a depressed mood with an anxious affect, but Behnke's orientation was intact, as were her thought processes, she had fair judgment and insight, and there was no

_____

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Case 2:14-cv-00012-PMS   Document 17   Filed 05/07/15   Page 10 of 31   Pageid#: 611

evidence of paranoia or delusions. (R. at 502, 509-10.) The only exceptions were on March 17, 2007, when it was noted, without explanation, that Behnke had transient paranoia/delusions, and on April 21, 2007, when her judgment and insight were deemed good. (R. at 509-10.) On April 7, 2007, it was noted that Behnke was in a better mood with less depressive episodes and that she had a new job. (R. at 510.) On April 21, 2007, her mood was improved. (R. at 510.)

Behnke saw Dr. Ick[10] on September 26, 2007, for evaluation of left flank pain existing for eight months and worsened by activity, as well as her long history of IC. (R. at 401.) Upon examination, Behnke indicated that her pain was more lumbar in nature. (R. at 401.) A renal ultrasound showed no hydronephrosis, masses or stones. (R. at 401.) Dr. Ick noted that Behnke's IC symptoms included dysuria, urgency, frequency and pain in the pelvis and bladder, relieved mildly by urination. (R. at 401.) Behnke had gotten some mild relief with Elavil, Cystospaz and Ativan. (R. at 401.) A physical examination was unremarkable except for a tender trigone area[11] to palpation. (R. at 401.) Dr. Ick noted that Behnke's IC symptoms had not been amenable to silver nitrate, DMSO, InterStim® implant and Elmiron, and he further noted that all the conventional therapies had failed to treat her IC over the years. (R. at 401.) Dr. Ick added Atarax to her regimen. (R. at 401.) He also offered to send Behnke to Vanderbilt for further evaluation of other treatments, but she declined at that time. (R. at 401.) Dr. Ick diagnosed IC and left back pain with a negative renal ultrasound. (R. at 401.) He noted that Behnke's back pain might be musculoskeletal in nature and advised her to follow up with her

---

[10] Dr. Ick's full name is not included in the record.

[11] The trigone area of the bladder is a triangular smooth area at the base of the bladder between the openings of the two ureters and that of the urethra. *See* www.medilexicon.com/medicaldictionary.php?+=93919 (last visited May 6, 2015).

primary care physician. (R. at 401.)

On November 5, 2007, Behnke saw Dr. Virginia Baluyot, M.D., at Tru Care Medical Clinic,[12] with complaints of sciatic nerve pain. (R. at 391.) She diagnosed Behnke with lower back pain, IC and a history of neurogenic bladder, and x-rays of the lumbar spine and left hip were ordered. (R. at 391.) These x-rays showed no left hip abnormality, lower lumbar disc space narrowing, and Behnke was prescribed Skelaxin and Lorcet. (R. at 391, 423.) Behnke continued to treat with Dr. Baluyot through June 4, 2008. (R. at 386-90.) Over this time, Behnke continued to complain of back pain and a pulling sensation in the right hip down the leg with nausea. (R. at 390.) She was treated with various medications, including Neurontin, Duragesic and a Lidoderm patch, which did not help. (R. at 387-88, 390.) A December 20, 2007, MRI of the lumbar spine showed a moderate-sized left posterior paracentral L4-L5 disc protrusion with thecal sac compression, leftward nerve root displacement and central spinal stenosis, both congenital and acquired. (R. at 344-45, 424-25.) A small central L5-S1 disc protrusion also was noted. (R. at 345, 425.) On January 2, 2008, Dr. Baluyot diagnosed chronic pain, degenerative joint disease, degenerative disc disease and sciatica. (R. at 389.) On January 24, 2008, Behnke was diagnosed with degenerative disc disease at the L4-L5 level of the spine with herniation and central spinal stenosis, and she was scheduled to undergo an electromyelogram, ("EMG"). (R. at 387.)

Behnke saw Dr. Rebekah C. Austin, M.D., a neurosurgeon, on January 24, 2008, for an initial consultation regarding lower lumbar pain, bilateral lower extremity pain, left greater than right, burning, and left foot pain and numbness.

---

[12] Dr. Baluyot's treatment notes are largely illegible. The court has attempted to decipher them to the best of its ability.

(R. at 359-62, 414-17.) She attributed her pain to the implantation of the InterStim® device implanted in 2002, after which time her leg pain progressively worsened, and she began to experience pulling of the left gluteal region, but minimal low back pain. (R. at 359, 414.) The device ultimately was removed in January 2005, but by this time, she had experienced left foot drop and a significant amount of weakness in the left leg. (R. at 359, 414.) Behnke completed four months of physical therapy with complete resolution of symptomatology, primarily left foot drop. (R. at 359, 414.) However, she continued to experience episodic pulling of the left gluteal region with burning at the ankle and knee, which would resolve with Tylenol. (R. at 359, 414.) She resumed her normal daily activities. (R. at 359, 414.) In November 2007, Behnke experienced an immediate onset of low back pain after walking a significant amount and moving a chair. (R. at 359, 414.) Her low back pain persistently increased, and she sought medical attention from her primary care physician, who prescribed muscle relaxants. (R. at 359, 414.) After a December 2007 MRI of the lumbar spine was obtained, Behnke underwent physical therapy and was treated with medications. (R. at 359, 414.) She also reported using Lortab for pain. (R. at 359, 414.) Behnke had not undergone an EMG of the leg. (R. at 359, 414.) Behnke rated her pain as a 4/10 to 10/10, increasing with any routine activities. (R. at 360, 415.)

In a review of systems, Behnke endorsed lazy bowel and frequent constipation, IC, bladder spasms, urinary frequency, urinary urgency and occasional incontinence. (R. at 360, 415.) She also reported low back pain, bilateral lower extremity pain, left worse than right, muscle spasms, headaches, left lower extremity numbness, left lower extremity tingling and situational depression. (R. at 360-61, 415-16.) Behnke appeared to be in moderate distress due to pain.

-13-

(R. at 361, 416.) A musculoskeletal examination revealed that she walked flexed at the waist and antalgic to the left. (R. at 361, 416.) Flexion was limited to 50 degrees resulting in increased pain from motion testing, extension was limited to five degrees, right lateralization was limited to 15 degrees, left lateralization was limited to 15 degrees, and straight leg raise testing was positive at 45 degrees on the left in the sitting position. (R. at 361, 416.) There was no limitation of motion of the head, neck or any of the extremities. (R. at 361, 416.) There was no evidence of dislocation or ligamentous laxity in any of the extremities. (R. at 361, 416.) Behnke had 5- strength globally and element of giveaway weakness with direct motor testing secondary to pain. (R. at 361, 416.) Strength was 5+, tone was normal, and no atrophy was noted in the head, neck, spine, ribs and pelvis, both upper extremities and the right lower extremity. (R. at 361, 416.) Finger-to-nose testing was performed without difficulty, as were rapid alternating hand movements. (R. at 361, 416.) Pronator drift was not present. (R. at 361, 416.) Sensation was intact to light touch and pinprick in all extremities. (R. at 361, 416.) Deep tendon reflexes were 2+/2+ in the biceps, triceps and brachioradialis, knee jerks were 1++/1++, and ankle jerks were 1++/1+. (R. at 361, 416.) There was no clonus. (R. at 361, 416.) Babinski's sign[13] testing resulted in flexion of the toes, and Hoffmann's sign[14] was negative. (R. at 361, 416.) On mental status examination, Behnke was fully oriented, and her mood and affect were appropriate. (R. at 361, 416.) Dr. Austin diagnosed lumbar herniated nucleus pulposus, ("HNP"), left L4-L5 level; lumbar stenosis, L4-L5 level; low back pain, acute; and lumbar radiculopathy, left L5 level. (R. at 362, 417.) She recommended

---

[13] Babinski's sign refers to the loss or lessening of the Achilles tendon reflex in sciatica. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1520 (27th ed. 1988).

[14] Hoffmann's sign indicates an increased mechanical irritability of the sensory nerves; the ulnar nerve is usually tested. *See* Dorland's at 1523.

a lumbar myelogram and EMG of the left leg. (R. at 362, 417.) Behnke stated her desire to proceed with surgery if indicated, and Dr. Austin opined that she likely would need a left hemilaminotomy and foraminotomy with correction of the left lateral recess at L4-L5 with decompression of the left L5 nerve root. (R. at 362, 417.)

A lumbar myelogram, dated January 30, 2008, showed a large anterior extradural defect at the L4-L5 level with moderate to severe central stenosis and bilateral L5 nerve root compression, left slightly worse than right. (R. at 337-38, 364-65.) The myelogram also showed a moderate anterior extradural defect at the L2-L3 level without focal nerve root compression and only mild central stenosis. (R. at 338, 365.)  X-rays taken post-myelogram showed a large central extrusion at the L4-L5 level extending just to the left of midline, and interval enlargement of herniation could not be excluded. (R. at 334-35, 363.)  There also was bilateral L5 nerve root compression, left worse than right, which tracked inferiorly from the intervertebral disc. (R. at 334, 363.) There was a posterior protrusion and spur at the L5-S1 level abutting the left S1 nerve root with no nerve root compression noted. (R. at 335.) There also was left foraminal stenosis at the L5-S1 level due to facet capsular calcification, but no nerve root compression in the foramina.  (R. at 335.) There was a disc bulge and shallow protrusion at the L2-L3 level with no significant stenosis at this level.  (R. at 335.)

On February 4, 2008, Behnke returned to Dr. Austin, at which time she appeared to be in moderate distress due to pain.  (R. at 302-06, 410-13.)  Physical examination was virtually identical to that performed on January 24, 2008, with few exceptions.  Examination of the left lower extremity revealed 4+ strength of

-15-

the EHL/anterior tibialis. (R. at 304, 412.) On mental status examination, Behnke again was fully oriented, and her mood and affect were appropriate. (R. at 305, 412.) The lumbar myelogram with postmyelographic CT scan performed on January 30, 2008, was reviewed, and revealed a central disc herniation lateralizing to the left with central stenosis and bilateral L5 nerve root compression, worse on the left. (R. at 305, 412.) There was some ligamentous hypertrophy and facetal hypertrophy at L4-L5 and mild central canal stenosis at the L2-L3 level. (R. at 305, 412-13.) Dr. Austin diagnosed lumbar HNP, left L4-L5; lumbar stenosis, L4-L5; low back pain, acute; and lumbar radiculopathy, left L5. (R. at 305, 413.) Behnke expressed her desire to proceed with a left endoscopic hemilaminotomy and discectomy at the L4-L5 level of the spine. (R. at 305, 413.) On February 18, 2008, Behnke underwent a left L3-L4 decompressive hemilaminectomy, medial facetectomy and herniated discectomy by Dr. Austin to correct the left L4-L5 HNP. (R. at 312-14.) She was discharged the following day with instructions to perform activities as tolerated. (R. at 316.)

When Behnke returned to Dr. Austin for a post-operative follow up on February 29, 2008, she was alert and cooperative and appeared in no acute distress. (R. at 372-74, 406-08.) Her gait was nonantalgic, and the surgical incision was well healed with no erythema or drainage. (R. at 373, 407.) She was fully oriented, and her mood and affect were appropriate. (R. at 372-73, 408.) Dr. Austin diagnosed lumbar HNP, left L4-L5, post-op; lumbar stenosis, L4-L5, operated resolved; low back pain, acute; and lumbar radiculopathy, left L5, resolving. (R. at 374, 408.) Behnke was given Valium and Bactroban and was continued on her other medications. (R. at 374, 408.) She was kept out of work at that time. (R. at 374, 408.) Behnke returned on April 1, 2008, reporting 90 percent improvement in

-16-

preoperative symptoms. (R. at 375-77, 403-05.) Behnke described her pain as an occasional catch of the low back occurring most with twisting or turning. (R. at 375, 403.) She denied any bowel or bladder difficulties with resolution of "lazy bowel syndrome" following surgery. (R. at 375, 403.) Overall, she was very pleased with the operative outcome and had no further complaints. (R. at 375, 403.) She stated that she was ready to return to work, as she had a sedentary position at a call center. (R. at 375, 403.) Prior to surgery, Behnke rated her pain as 8/10, but after surgery, she rated it a 1/10. (R. at 376, 404.) Her gait was nonantalgic. (R. at 376, 404.) Behnke was oriented with an appropriate mood and affect. (R. at 376, 404.) Dr. Austin diagnosed Behnke with lumbar HNP, left L4-L5, post-op; lumbar stenosis, L4-L5, operated resolved; low back pain, acute; and lumbar radiculopathy, left L5, resolving. (R. at 377, 405.) A routine home exercise program for prevention of future complications was recommended, and she was released to return to work on April 2, 2008. (R. at 377, 405.)

Behnke continued to seek treatment from Dr. Baluyot from September 4, 2008, through May 26, 2010. (R. at 379-85, 520.) Over this time, Behnke complained of continued urinary frequency and incontinence, left shoulder pain and numbness in the fingers, neck pain and severe headaches. (R. at 379-85, 520.) An EMG of the right upper extremity and neck, performed on July 9, 2009, yielded normal results. (R. at 397.) Left shoulder x-rays also were unremarkable. (R. at 399, 455.) Cervical spine x-rays taken on July 16, 2009, revealed reversal of the cervical lordosis, as well as some uncovertebral spurring, producing mild to moderate stenosis at the C5-C6 level on the right. (R. at 398, 454.) Over this time, Dr. Baluyot diagnosed Behnke with symptomatic and chronic IC; tachycardia, controlled; generalized anxiety disorder; post-laminectomy; chronic depression;

Case 2:14-cv-00012-PMS   Document 17   Filed 05/07/15   Page 17 of 31   Pageid#: 618

chronic pain; migraine headaches; and emotional stress. (R. at 379-81, 383-85, 520.) On September 15, 2009, Behnke reported doing "fairly well," stating that she was using an inversion table to help her back. (R. at 381.) In connection with her headache complaints, Behnke reported that she was caring for her grandfather, and on May 26, 2010, when Dr. Baluyot noted that she appeared to be emotionally stressed, Behnke indicated that she was her grandfather's primary caregiver. (R. at 520.)

On June 28, 2010, Behnke saw Dr. Felix E. Shepard, Jr., a urologist, at Dr. Baluyot's referral, for evaluation of IC. (R. at 446-49.) Behnke reported symptoms present for several years and bladder infections, which worsened the IC symptoms. (R. at 446.) Her symptoms included bilateral back pain, dysuria, bilateral flank pain, dyspareunia, moderate urgency, frequency every hour, suprapubic abdominal pain, constipation, occasional dribbling, nocturia zero to one time nightly and urgency most of the time. (R. at 446.) These symptoms were aggravated by caffeine, cola drinks, intercourse, spicy foods and tomatoes. (R. at 446.) In addition to these genitourinary symptoms, a review of systems was positive for headaches, sluggishness, abdominal pain, nausea/vomiting and sinus problems. (R. at 447.) An examination of Behnke's back was within normal limits, and no CVA tenderness to fist percussion was noted. (R. at 447.) Behnke was well oriented. (R. at 447.) Dr. Shepard diagnosed chronic IC, he instructed her to void every two hours, advised her to begin a bladder irritant diet, increase fluid intake and limit spicy foods, and he prescribed Elmiron and Lortab. (R. at 448-49.) Dr. Shepard also administered a bladder cocktail by catheter, as Behnke was having a flare of irritative bladder symptoms and was in considerable discomfort. (R. at 449.) Behnke continued to treat with Dr. Shepard through August 11, 2010. (R. at

438-45.) Over this time, she reported doing much better, but received five more bladder cocktails. (R. at 440, 442-45.) When Behnke saw Dr. Shepard on August 11, 2010, he noted that she had received antidepressants, Atarax, bladder irrigation, diet change and Elmiron to treat her IC. (R. at 438.) He further noted that Behnke's symptoms were improved, although she was unable to tolerate the Elmiron. (R. at 438.) Dr. Shepard continued to diagnose Behnke with IC, and he instructed her to void every two hours, continue the bladder irritant diet, increase fluid intake and limit spicy foods, and he continued her on Atarax and Elavil. (R. at 439-40.) Dr. Shepard administered a bladder cocktail. (R. at 440.)

When Behnke returned to Dr. Baluyot on November 10, 2010, she continued to complain of frontal headaches. (R. at 521.) Dr. Baluyot diagnosed IC and sinusitis problems and continued her on her medications. (R. at 521.)

On January 11, 2011, Behnke saw Dr. Shepard with complaints of pressure and "goose bumps" with urination. (R. at 435-37.) She reported doing well following the August 11, 2010, bladder cocktail, until two weeks prior, when she began having bladder pain, frequency and urgency. (R. at 435.) An examination of the back was within normal limits, with no CVA tenderness to fist percussion. (R. at 436.) Dr. Shepard administered another bladder cocktail, he diagnosed IC, and he prescribed Lortab. (R. at 436-37.) All other previous instructions remained in place. (R. at 437.) By April 12, 2011, Behnke reported improved symptoms, noting no bladder infections since her last visit, as well as no dysuria, frequency, hematuria or nocturia. (R. at 431-34.) A back examination was within normal limits, with no CVA tenderness to fist percussion. (R. at 432.) Dr. Shepard diagnosed chronic IC, he instructed her to void every two hours, follow a bladder

-19-

irritant diet, increase fluid intake, avoid spicy foods, and he prescribed Lortab. (R. at 432-33.) A week later, on April 19, 2011, Behnke returned to Dr. Shepard for a bladder cocktail for a flare of irritative bladder symptoms. (R. at 430.) She returned for two additional bladder cocktails on April 28 and May 4, 2011. (R. at 428-29.)

Behnke saw Dr. Baluyot on June 14, 2011, with complaints of sciatic pain. (R. at 523.) She stated that she could not ambulate well and needed something done. (R. at 523.) Dr. Baluyot noted tenderness in the left sciatic area, and she prescribed Zanaflex and Lortab. (R. at 523.)

On July 12, 2011, Dr. Donald Williams, M.D., a state agency physician, completed a Case Analysis in connection with Behnke's initial claim for disability. (R. at 52-58.) The last evidence submitted for Dr. Williams's review dated from 2008, which he noted was nearly two full years prior to the expiration of Behnke's date last insured. (R. at 55.) Thus, Dr. Williams found that there was insufficient evidence to fully adjudicate her claim. (R. at 55.) Julie Jennings, Ph.D., a state agency psychologist, made the same finding on July 16, 2011, in connection with Behnke's initial claim. (R. at 56.) On reconsideration, Robert Keeley, MC, another state agency medical source, concluded on September 13, 2011, that Behnke's endometriosis was not a severe impairment, nor was her chronic IC. (R. at 64.) Keeley further found that, following a hemilaminectomy, medial facetectomy and herniated discectomy in February 2008, Behnke's condition improved, and she made no further complaints of back pain prior to her date last insured. (R. at 63.) Stephanie Fearer, Ph.D., a state agency psychologist, also completed a Psychiatric Review Technique form, ("PRTF"), on September 14, 2011, finding that there was insufficient evidence from which to rate Behnke's restriction on activities of daily

-20-

living because she did not return her Function Report. (R. at 65.) She further found that Behnke had no difficulties maintaining social functioning, maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 65.) Fearer concluded that Behnke suffered from no severe mental impairment. (R. at 65.)

Behnke underwent another Intake Assessment at Abingdon Center on November 12, 2011. (R. at 511-15.) She endorsed variable insomnia, but reported a normal appetite and normal energy, with no crying spells or panic attacks. (R. at 512.) Her presenting problem was described as depressive cycles, poor coping skills and marital issues. (R. at 513.) On mental status examination, Behnke was fully oriented with normal speech, fair communication, average intelligence, no evidence of a thought disorder, no suicidal or homicidal thoughts, appropriate behavior and calm motor activity, but she had poor insight, poor judgment and a depressed mood and affect. (R. at 513.) She was diagnosed with major depressive affective disorder, recurrent, severe, without psychotic behavior; and observation of other suspected mental condition; and her then-current GAF score was placed at 65.[15] (R. at 514-15.) She was scheduled for 10 individual therapy sessions. (R. at 514.)

Behnke returned to Dr. Baluyot on February 9, 2012, with complaints of neck and left shoulder pain with a burning sensation and numbness of the thumb. (R. at 524.) Dr. Baluyot diagnosed IC, stable; neuropathy; and chronic depression, among other things, and she prescribed Flexeril in addition to Behnke's other

---

[15] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

medications. (R. at 524.) X-rays of the cervical spine, taken this same date, showed degenerative changes with disc disease at the C5-C6 and C6-C7 levels, as well as mild reversal of the normal lordotic curvature. (R. at 517.) A February 23, 2012, MRI of the cervical spine showed a tiny central disc bulge at the C4-C5 level with no effect on the cord, a five millimeter central and left lateral disc bulge with mild compression of the cord and left-sided foraminal narrowing at the C5-C6 level and a three millimeter broad-based disc bulge with no significant effect on the cord at the C6-C7 level. (R. at 516.)

When Behnke saw Dr. Baluyot on March 8, 2012, she reported that she was scheduled for a discectomy of various cervical spinal levels on March 19, 2012. (R. at 525.) Dr. Baluyot diagnosed chronic pain syndrome, and she prescribed Lortab. (R. at 525.)

On April 19, 2012, Behnke was seen at Pikeville Medical Center for a post-operative visit after having undergone an anterior cervical discectomy and fusion of the C5-C6 and C6-C7 levels of the spine on March 19, 2012,[16] for complaints of neck and shoulder pain. (R. at 461-64.) Behnke was alert and oriented, and her range of motion of the involved region was acceptable post-operatively. (R. at 463.) She was diagnosed with cervical spondylosis without myelopathy and was advised to advance activity as tolerated. (R. at 463.)

Behnke saw Dr. Baluyot on December 13, 2012, reporting that she had undergone the neck fusion. (R. at 526.) She continued to complain of sciatica on the left with decreased sensation in the heel. (R. at 526.) Dr. Baluyot wrote a "To

---

[16] These actual surgical notes are not contained in the record.

-22-

Whom It May Concern" letter, dated December 13, 2012, stating that Behnke had been under her medical care since 2005-2006. (R. at 528-29.) According to Dr. Baluyot, one of Behnke's worst conditions had been, and continued to be, IC, which was controlled by medications, to the extent that she could get out of her house for approximately 30 minutes. (R. at 528.) Dr. Baluyot also further stated that Behnke suffered from irritable bowel syndrome and degenerative disc disease, for which she recently had undergone a cervical laminectomy for nerve compression at the C4-C7 levels, and she had undergone a lumbar laminectomy in 2008. (R. at 528.) Dr. Baluyot opined that Behnke's activity was limited due to her symptoms, particularly her bladder pain and symptoms, noting that Behnke's pain was constant and rated at 7-8/10. (R. at 528.) She further noted that Behnke suffered depression secondary to the above-mentioned conditions. (R. at 528.) Dr. Baluyot opined that Behnke was a candidate for disability based on these conditions. (R. at 528.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

-23-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Behnke argues that the ALJ erred by failing to fully develop the record and obtain consultative evaluations or have medical experts present at the hearing to testify regarding the severity of her impairments. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Behnke also argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Baluyot. (Plaintiff's Brief

-24-

at 5-6.)

After a review of the evidence of record, I find Behnke's arguments unpersuasive. To support her first argument, that the ALJ erred by failing to fully develop the record and obtain consultative evaluations or have medical experts present to testify at the hearing regarding the severity of her impairments, Behnke refers to the ALJ's statement that "[t]he State agency physicians and psychologists stated that they lacked sufficient evidence to evaluate the claimant's functional ability." (R. at 20.) It is well-settled that the ALJ has a duty to develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "…the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." 783 F.2d at 1173. The regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. § 404.1513(e) (2014); *see also Kersey v. Astrue*, 614 F. Supp. 2d 679, 693-94 (W.D. Va. 2009). "This duty [to fully develop the record], however, does not transform the ALJ into claimant's counsel and the ALJ 'has the right to assume that counsel is presenting the claimant's strongest case for benefits.'" *Johnston v. Colvin*, 2014 WL 534080, at *9 (W.D. Va. Feb. 10, 2014) (quoting *Blankenship v. Astrue*, 2012 WL 259952, at *13 (S.D. W. Va. Jan. 27, 2012) (citations omitted)). Thus, the inquiry in determining "whether the record is adequate to support a judicious administrative decision" centers on whether there are "evidentiary gaps" that prejudice the rights of the claimant. *Johnston*, 2014 WL 534080, at *9 (quoting *Blankenship*, 2012 WL 259952, at *13 (citing *Marsh v.*

-25-

*Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). The decisions to purchase a consultative examination or to call a medical expert to testify both fall within the ALJ's discretion. *See* 20 C.F.R. §§ 404.1519a(b), 404.1527(e)(2)(iii) (2014). I find that no such evidentiary gaps exist here, and the record before the ALJ was more than sufficient for him to make a determination regarding the severity of Behnke's impairments and their effect on her ability to work.

It is true that the ALJ indicated the state agency medical and psychological sources' inability to evaluate Behnke's functional ability due to insufficient evidence. While the ALJ cited to both the initial and reconsideration determinations, only the state agency sources who conducted the initial disability determination in July 2011 deemed the evidence insufficient to make a disability determination. (R. at 20.) On reconsideration, in September 2011, the state agency sources made determinations without finding the evidence to be insufficient. In the initial determination, the state agency sources noted that, while Behnke's alleged onset date was September 30, 2008, and the date last insured was March 31, 2010, the last medical evidence submitted by Behnke was dated in April 2008, five months prior to the start of the relevant time, and nearly two years prior to the date last insured. (R. at 55.) On reconsideration, additional evidence was submitted, and it was determined that Behnke did not have a severe physical or mental impairment. (R. at 63-65.) In any event, the ALJ had more than enough evidence before him to determine that neither Behnke's physical impairments nor her mental impairments were disabling.

With regard to Behnke's physical impairments, the ALJ found that she suffered from severe sciatica; degenerative disc disease; IC; and endometriosis. In

arriving at this decision, he considered Behnke's testimony and statements, as well as medical records dating from 2000 through 2012. The record was fully developed as to the relevant period of September 30, 2008, through March 31, 2010, and the ALJ considered much evidence outside of this period, although not obligated to do so. With regard to Behnke's musculoskeletal impairments, the ALJ noted that her low back pain was mostly improved by April 2008 after undergoing surgery, and he further noted that Behnke only occasionally mentioned neck and upper extremity pain in June and July 2009. Otherwise, Behnke's treatment for her low back and neck pain was conservative during the period at issue.

With regard to Behnke's IC symptoms, the ALJ noted that, despite her complaints of urgency and frequency, the records included no specific complaints of urinating 20 to 30 times daily as she had testified. The ALJ further noted that Behnke was able to work on a full-time basis, both prior to and during the relevant period with similar IC symptoms. Moreover, the records demonstrate that Behnke did not seek regular treatment from a urologist for her IC symptoms until after her date last insured. I find that, given all of this evidence, there were no evidentiary gaps, and the evidence was adequate for the ALJ to evaluate the effects of Behnke's IC on her ability to function during the relevant period.

I further find that the record was fully developed with regard to Behnke's mental impairments. As stated by the ALJ, Behnke rarely mentioned any psychiatric symptoms during the relevant time. She briefly attended therapy in 2007, prior to the alleged onset date, but did not continue such treatment during the relevant time period. While Behnke did report increased symptoms in March 2010, it was related to increased stress from caring for her grandfather. She did not seek

mental health treatment again until November 2011, more than a year and a half after the expiration of the date last insured, but there is no evidence she followed through with this treatment beyond the initial intake. Her GAF score at that time was 65, indicating only mild symptoms.

For all of these reasons, I find that the ALJ had sufficient evidence before him to evaluate Behnke's claims relating to both her physical and mental impairments. I further find that the ALJ did not substitute his opinion for that of trained medical professionals, as Behnke argues. As the Commissioner argues in her brief, and as noted above, the state agency consultative sources at the reconsideration level did not find that there was insufficient evidence to evaluate Behnke's claims, but they found there was insufficient evidence to establish that Behnke's impairments were severe on or prior to her date last insured. Moreover, Behnke submitted additional evidence at the ALJ level that was not before the state agency examiners for review, and that ALJ considered Behnke's testimony at her hearing. Given all of this evidence, the ALJ found Behnke's impairments severe and limited her to the performance of a range of medium work with some nonexertional limitations, including access to restrooms as found in a typical business office or place of business open to the public, which was consistent with Dr. Shepard's recommendation that she void every two hours.

It is clear from the evidence of record that no ambiguity existed that would require the services of a consultative examiner or medical expert. The court notes that Behnke did not request additional time to keep the record open for the submission of additional medical records, nor did she request that the ALJ obtain a consultative examination or medical expert testimony. Also, it is important to note

that none of Behnke's treating physicians limited her work-related activities during the relevant time period from September 30, 2008, to March 31, 2010. In fact, after back surgery, Dr. Austin released Behnke to return to work in April 2008. At that time, Behnke reported that her back symptoms had improved by 90 percent, and she denied suffering any bowel or bladder difficulties. It is for all of these reasons that I find that the record before the ALJ contained sufficient evidence to support his decision that Behnke was not disabled during the relevant time period.

Behnke also argues that the ALJ should have given controlling weight to the opinion of Dr. Baluyot, her treating physician. I am not persuaded. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinion of Dr. Baluyot. In a letter dated December 13, 2012, nearly three years after the

-29-

expiration of Behnke's date last insured, Dr. Baluyot opined that she should be awarded disability benefits primarily due to her IC. Dr. Baluyot did not, however, place any specific restrictions on Behnke's physical or mental work-related activities. The ALJ stated that he was giving little weight to Dr. Baluyot's opinion because it was inconsistent with the medical evidence relevant to the period before her date last insured. (R. at 20.) The ALJ stated that, before March 31, 2010, Behnke's date last insured, she had only infrequent complaints of IC symptoms and that the medical evidence between the alleged onset date and the date last insured did not show that her IC symptoms were any worse than when she worked on a full-time basis. Furthermore, the ALJ stated that, although Dr. Baluyot opined Behnke additionally was disabled by neck and low back impairments, she rarely complained of neck pain prior to March 31, 2010, and her low back pain improved by 90 percent with surgery in 2008. Additionally, there was little evidence that Behnke's depression, which Dr. Baluyot described as a secondary condition, significantly limited her functional ability. Therefore, I find that substantial evidence supports the ALJ's decision not to afford Dr. Baluyot's opinion controlling weight.

The court notes that, in any event, the ALJ did find, despite the minimal records, that Behnke had some IC symptoms during the relevant period, including urgency, frequency and bladder pain, and that she experienced some limitations as a result of her neck and low back impairments, as well as her depression. However, the ALJ's residual functional capacity finding accounted for Behnke's impairments and limitations that were supported by the substantial evidence of record.

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's decision not to obtain consultative evaluations or expert medical testimony, as well as the ALJ's decision to accord little weight to the opinion of Dr. Baluyot. I further find that the evidence cited above provides substantial evidence supporting the ALJ's finding as to Behnke's residual functional capacity and his finding that Behnke was not disabled on or prior to March 31, 2010. An appropriate order and judgment will be entered.

ENTERED: May 7, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE